# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>         Plaintiff,<br><br>v.<br><br>PROSPECT AIRPORT SERVICES, INC., et al.,<br><br>         Defendants. | Case No. 2:05-01125-KJD-GWF<br><br>**ORDER** |

Currently before the Court is Defendant Prospect Airport Services, Inc.'s ("Prospect" or "Defendant") Motion for Summary Judgment (#31), filed on December 15, 2006. Plaintiff filed a Response (#32) on January 16, 2007, and Defendants filed a Reply (#37) on January 29, 2007.

**I. Background**

On September 13, 2005, the Equal Employment Opportunity Commission ("EEOC") filed a Complaint pursuant to Title VII of the Civil Rights Act of 1964, and Title I of the Civil Rights Act of 1991, on behalf of Mr. Rudolpho Lamas ("Lamas") alleging that Lamas was subjected to sexual harassment during his employment with Prospect that affected the terms and conditions of his employment. EEOC alleges that Lamas was subjected to a hostile work environment by co-worker

Silvia Munoz ("Munoz").  EEOC claims that Defendant Prospect knew or should have known about the harassment and failed to take timely and appropriate corrective action.  (See Pl.'s Compl. at 1–2).

Lamas became employed with prospect in April, 2002, where he worked until his termination on July 1, 2003.  Lamas initially worked as a Passenger Service Assistant (PSA), assisting passengers with wheelchair services at the Las Vegas Airport, but soon was promoted to be a lead PSA.  During the time of his employment with Prospect, Lamas alleges that another employee, Munoz—a passenger service agent/dispatcher—engaged in conduct that subjected him to a hostile work environment.  Summarily, said behavior includes Munoz giving Lamas three notes, two indicating her desire to go out with him, and one indicating that Munoz had dreamed of bathing together with Lamas.  Munoz asked Lamas to go out with her, and had other Prospect employees relate messages of interest to Lamas on her behalf.  At one point Munoz gave Lamas a photo of herself, with her hands holding/covering her breasts and exposing her cleavage.  Lamas also claims that sometime prior to leaving his employment with Prospect, Munoz kissed him on the cheek.

Lamas admits that there were times when Munoz came on to him that he did not tell her to stop, (Def.'s Mot. for Summ. J. Ex. A at 136), and that he may have said certain things to her that she might have construed as him wanting to go out with her.  (Def.'s Mot. for Summ. J. Ex. A at 25, 28.) Munoz alleges that Lamas led her to believe he was interested in dating her, that Lamas stared at her on several occasions, that other employees told her that Lamas was interested in her, and that rather than her kissing Lamas on the cheek prior to his departure as he alleges, he approached her and kissed her passionately on the lips for about one minute.

More specifically, Lamas alleges that Munoz gave him three to four notes in the summer/fall of 2002 expressing her desire to date him.  Munoz gave Lamas the first note in or around November, 2002, but Lamas does not recall that the note had any sexual content.  After receiving the note, Lamas went to Assistant Manager, Patrick O'Neill ("O'Neill") to discuss the matter.  According to Lamas, his intention in speaking with O'Neill was not to file a complaint, but to seek O'Neill's advice on how to handle the situation.  (Def.'s Mot. for Summ. J. Ex. A at 31–32.)  Lamas testified

that he discarded the note, and a day or two later told Munoz that he was not interested in a relationship with her. (Def.'s Mot. for Summ. J. Ex. A at 32–34.)

According to Lamas, Munoz subsequently gave him a second note. Though Lamas does not recall the words of the second note, he claims that it was short—about three sentences—and contained nothing sexual, but was intended to convince him that Munoz was serious about the first note. (Def.'s Mot. for Summ. J. Ex. A at 36–37.) Lamas discarded the note and did not respond to Munoz about it. (Def.'s Mot. for Summ. J. Ex. A at 38–41.) Lamas spoke with his supervisor Rhonda Thompson (Thompson) about the note, but did not claim that Munoz was harassing him. Instead, upon Thomas questioning Lamas as to whether he felt Munoz was sexually harassing him, he answered "no". (Def.'s Mot. for Summ. J. Ex. A at 120.)

Close to the time wherein Munoz gave Lamas the second note, Lamas claims that Munoz also gave him a photograph of herself in which she was holding/covering her breasts with her hands, and exposing her cleavage. (Def.'s Mot. for Summ. J. Ex. A at 61–62.) Lamas did not show or describe the photo to Thompson or Mitchell. Lamas gave the photo back to Munoz, and describes his reaction to it as, "I was irritated. She was bothering me, pestering me . . . she was a pest." (Def.'s Mot. for Summ. J. Ex. A at 64–65.) Apparently, at this time Lamas returned to Thompson to complain about the behavior of this meeting. Thompson testified that "a few days later [Lamas] came to me again and said he got an obscene picture of her - he said it was a picture of her naked and holding her breasts. He seemed like he was disturbed by it." (Pl.'s Opp. Ex 8 p 3.) In all, Thompson testified that Lamas came to her about four times within a two to three day period before she took the matter to General Manager Dennis Mitchell ("Mitchell"). (Pl.' Opp. Ex. 8.)

In December, Munoz gave Lamas a third note, in which Lamas describes Munoz crossed over the line regarding sexual harassment. (Def.'s Mot. for Summ. J. Ex. A at 38.) Specifically, in the third note, Munoz states that "I've been having crazy dreams about us in the bath tub, yeah in the bath tub . . . It seems I cannot get you off my mind no matter how hard I try . . . I do want you

3

sexually and romantically." (Defs.' Mot. for Summ. J. Ex. Lamas 1.)  At that time, Lamas did not show the third note to Thompson, however he did speak with her about it.

Lamas claims that Munoz did not speak to him for some time after giving him the third note, however several co-workers made comments to him about Munoz's interest in a relationship with him.  According to Lamas, because of these comments, he did not feel that Thompson had properly taken care of the situation and went to Mitchell in January 2003 to discuss Munoz. (Def.'s Mot. for Summ. J. Ex. A at 70.)  Lamas showed the note to Mitchell, about which, Mitchell stated Lamas was grinning while Mitchell read it. (Def.'s Mot. for Summ. J. Ex. C at 75.)  In regard to smiling while Mitchell read the note, Lamas has explained that he may have been smiling because of his geogenetic [sic] personality, and because he smiles a lot, "even in the worst of times." (Def.'s Mot. for Summ. J. Ex. A at 122–23.)  Lamas testified that he believed he "made it clear to [Mitchell] that [he] was hurt by [the note] because other co-workers were now saying things, and [he] was starting to become embarrassed." (Def.'s Mot. for Summ. J. Ex. A at 52–53.)

Lamas advised Mitchell that he did not want to file a complaint against Munoz because he did not want her to get in trouble or to cause her embarrassment. (Def.'s Mot. for Summ. J. Ex. C at 70–71, 108.)  Instead, Lamas desired that Mitchell would talk to Munoz. Id.  Mitchell met with Munoz two days later with Thompson present as a witness.  Mitchell stated that during the meeting he kept the name of the complainant confidential, but informed Munoz that a male co-worker had complained in regard to Munoz pursuing him.  Mitchell instructed Munoz to stop pursing the male co-worker, and that if she did not, further action would be taken. (Def.'s Mot. for Summ. J. Ex. C at 78–79, 86.)  Mitchell described that Munoz appeared embarrassed by the accusations, acknowledged her understanding of the situation, and agreed to stop pursuing the male co-worker. (Def.'s Mot. for Summ. J. Ex. C at 78-79, 104–05; Ex. D at 19.)  Mitchell also testified however that Munoz stated that the male co-worker had pursued her. (Def.'s Mot. for Summ. J. Ex. C at 79.)

Following the meeting, Mitchell told Lamas that he had met with Munoz and had taken care of the problem.  Lamas testified however that after his meeting with Mitchell, Munoz continued to

4

make comments to him in passing such as "Hey Hey," "Whew Whew," "I was thinking about you last night," "Do you want to have some fun?" and "Do you want to get together?" (Def.'s Mot. for Summ. J. Ex. A at 67–70.) Lamas also alleges that Munoz made non-verbal gestures such as making faces, "licking her lips," and making "blow job imitations." (Lamas Depo 70:3-12; 113: 7–11). Lamas also alleges that on May 13, 2003, Munoz twice asked him to go out with her. (Def.'s Mot. for Summ. J. Ex. A at 105–06.)

When asked if Munoz ever touched him inappropriately, Lamas testified that between February and May 2003, Munoz kissed him on the cheek on the lower level of the airport when no one else was around. (Def.'s Mot. for Summ. J. Ex. A at 109–11.) Other than the alleged kiss, Lamas states that Munoz did not engage in any other inappropriate touching.

## II. Standard of Law for Summary Judgment

Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The burden then shifts to the nonmoving party to set forth specific facts demonstrating a genuine factual issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(e).

All justifiable inferences must be viewed in the light must favorable to the nonmoving party. See Matsushita, 475 U.S. at 587. However, the nonmoving party may not rest upon the mere allegations or denials of his or her pleadings, but he or she must produce specific facts, by affidavit or other evidentiary materials provided by Rule 56(e), showing there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The court need only resolve factual issues of controversy in favor of the non-moving party where the facts specifically averred by that party contradict facts specifically averred by the movant. See Lujan v. Nat'l Wildlife Fed'n., 497

U.S. 871, 888 (1990); see also Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345 (9th Cir. 1995) (stating that conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment).  "[U]ncorroborated and self-serving testimony," without more, will not create a "genuine issue" of material fact precluding summary judgment. Villiarimo v. Aloha Island Air Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).

Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Summary judgment shall not be granted if a reasonable jury could return a verdict for the nonmoving party. See Anderson, 477 U.S. at 248.

**III. Analysis**

As stated above, the EEOC, on behalf of Lamas, has filed a claim against Prospect, alleging that Prospect engaged in unlawful employment practices at its service facility at Las Vegas International Airport, in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), and that as a result, employee Lamas was repeatedly subject to unlawful sexual harassment and a hostile work environment.  The EEOC further alleges that Prospect knew or should have known about the harassing conduct and failed to take immediate and effective action to prevent the harassment.

**1.  Hostile Work Environment**

Under Title VII, it is unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of his race, color, religion, sex, or national origin.  See 42 U.S.C. § 2000e-2(a)(1).  To prevail on a hostile work environment claim premised on either race or sex, a plaintiff must show: (1) that he/she was subject to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive as to alter the conditions of the plaintiff's employment and create an abusive work environment.  See Gregory v. Widnall, 153 F.3d 1071, 1074 (9th Cir. 1998).  Defendant has moved for Summary Judgment on Plaintiff's claim of sexual discrimination based on a hostile work environment.  Defendant alleges that the environment

suffered by Plaintiff was not sufficiently severe or pervasive to alter the conditions of the Plaintiff's employment or create an abusive working environment.

The Supreme Court has suggested that District Courts consider "all the circumstances" of a Title VII violation claim to determine whether an environment is hostile or abusive, including the following factors; (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct is physically threatening, humiliating, or merely an offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance.  See Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).  Furthermore, the Supreme Court has advised that district courts may properly look to the EEOC Guidelines when examining hostile work environment harassment claims.  See Meritor Savings Bak v. Vinson, 477 U.S. 57, 65 (1986).  The EEOC Guidelines describe hostile work environment harassment as, "[c]onduct [which] has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment." Id. citing 29 C.F.R. § 1604.11(A)(3)(1985).

The sexual harassment analysis requires both an objective and subjective test.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  To be actionable, the conduct at issue must be sufficiently severe and pervasive (a) as perceived by a reasonable victim; and (b) as actually perceived by the plaintiff. Id.  Moreover, the Ninth Circuit has adopted a "reasonable woman,' and "reasonable man" standard when applying the objective prong.  See Ellison v. Brady, 924 F.2d 872, 897 (9th Cir. 1991).  More recent cases however, have stated that the determination of "whether the workplace is objectively hostile must be determined from the perspective of a reasonable person with the same fundamental characteristics." Fuller v. City of Oakland, 47 F.3d 1522, 1527 (9th Cir. 1995).

In order for an employer to be liable for the conduct of an employee-coworker, as opposed to a supervisor, the "plaintiff must prove that the employer was negligent, *i.e.*, that the employer knew or should have known of the harassment but did not take adequate steps to address it." Swinton v.

1  Potomac Corp., 270 F.3d 794 (9th Cir. 2001) (citing Nichols v. Azteca Restaurant Enters., 256 F.3d
2  864, 875 (9th Cir. 2001).

**A. Frequency, Severity, and Type of Conduct**

Together, the harassment Plaintiff alleges consists of three or four notes given to Lamas by Munoz between the dates of November 2002, to August 2003, (only one of which was sexual in nature), that Munoz asked him out on three to four occasions, that Munoz showed him a photo of her cleavage, that Munoz asked co-workers to relay messages of interest to him or to find out if he was interested in her, that Munoz made flirtatious comments and non-verbal gestures to him in passing, and that on one occasion Munoz kissed him on the cheek.

In considering the alleged harassing conduct Plaintiff asserts in light of "all of the circumstances" of the case, the Court does not find Defendants' behavior to be severe enough to sustain Plaintiff's Title VII claim on Lamas's behalf. Here, the most offensive portion of Munoz's alleged actions, showing Lamas a revealing photograph, giving him a note referring to sex, or kissing him on the cheek, pales in comparison to other conduct found to be severe enough to create a hostile work environment. See, e.g. Henderson v. Simmons Foods, Inc., 217 F.3d 612, 616 (8th Cir. 2000) (groping and shoving broom handle in crotch); Bailey v. Runyon, 167 F.3d 466, 467 (8th Cir. 1999) (grabbing crotch); Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1067 (10th Cir. 1998) (putting mouth on breast); Zimmerman v. Cook County Sheriff's Dep't, 96 F.3d 1017, 1018 (7th Cir.1996) (grabbing breast and rubbing buttocks); Varner v. Nat'l Super Markets, Inc., 94 F.3d 1209, 1211 (8th Cir. 1996) (grabbing breasts); Waltman v. Int'l Paper Co., 875 F.2d 468, 472 (5th Cir. 1989) (grabbing breasts and directing high pressure hose at crotch); Hall v. Gus Construction Co., Inc., 842 F.2d 1010, 1012 (8th Cir. 1988) (rubbing thighs and grabbing breasts); Bohen v. City of East Chicago, 799 F.2d 1180, 1182 (7th Cir. 1986) (pressing hands against crotch); Jones v. Wesco Invs., 846 F.2d 1154, 1155 (8th Cir.1986) (touching breasts, putting hand up dress, pinching and patting buttocks, and kissing on lips).

Viewing the allegations of Munoz's behavior described by Lamas, as well as the facts described by all parties in the light most favorable to the non-moving party, while applying the reasonable person standard—or stated more accurately, the standard of a reasonable person with Lamas's same fundamental characteristics—the Court does not find that the alleged harassment rises to a level sufficiently severe and pervasive to sustain Plaintiff's Title VII claim. Lamas admits that most men in his circumstances would have "welcomed" the behavior he alleged was discriminatory, but that due to his Christian background he was "embarrassed." (Def.'s Mot. For Summ, J. Ex. Lamas 2.) Moreover, in its opposition, the EEOC states that Munoz's actions were "not severe," arguing instead, that "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." (Pl.'s Opp. at 8.)

Here, the Court does not find the pervasiveness or frequency of the alleged harassment to be sufficient to withstand summary judgment. Lamas has admitted that he did not feel Munoz crossed the line of sexual harassment until she wrote the third note in or around August of 2002. Allegedly, the photograph incident occurred around this same time. The alleged kiss on the cheek occurred between February to May 2003. (Def.'s Mot. for Summ. J. Ex. A at 109.) The alleged subsequent incidents of Munoz asking Lamas to go out with her occurred in May 2003. Moreover, Plaintiff fails to state the number of occasions the alleged flirtatious comments and gestures occurred in passing between January and July 2003.

Taken independently or together, the Court cannot find, as a matter of law, that Plaintiff's allegations of harassment constitute a hostile or abusive environment.

**B. Interference with Work Performance**

As touched on above, "[t]o assert a Title VII claim based on a hostile work environment, a plaintiff must allege a 'pattern of ongoing and persistent harassment severe enough to alter the conditions of employment. The working environment must 'both subjectively and objectively be perceived as abusive' because of the harassment." Burrell v. Star Nursery, Inc., 170 F.3d 951, 955

(9th Cir. 1999). A careful consideration of the instant case in light of all of the circumstances demonstrates that Munoz's alleged harassment did not alter the Conditions of Lamas's employment.

The Court notes that Lamas never filed a formal complaint against Munoz, although asked by both his supervisor Thompson, and General Manager Mitchell on separate occasions if he desired to do so. When asked by Thompson whether he felt Munoz was sexually harassing him, Lamas answered "no." (Def.'s Mot. for Summ. J. Ex. A at 120.) Furthermore, Mitchell reports that Lamas was "smiling" when he showed him (Mitchell) the third note, and Lamas admits that he might have said certain things to Munoz that she might have construed as him wanting to go out with her. (Def.'s Mot. for Summ. J. Ex. A at 25, 28.) Overall, and throughout his deposition, Lamas describes his attitude regarding Munoz and her behavior toward him as "irritated," that he felt Munoz was a "pest", and that she was "bothering" and "pestering" him. (Def.'s Mot. for Summ. J. Ex. A at 64–65.) He never alleges that his work environment was altered due to Munoz's behavior. Instead, he states that he was "hurt" and/or "embarrassed" by the notes because co-workers were asking him and teasing him about the situation. When asked whether his job performance was negatively affected by the harassment with respect to certain disciplinary measures, Lamas stated that he "does not know." (Def.'s Mot. for Summ. J. Ex. A at 145–46; 148–49.) Furthermore, Lamas confirmed that Munoz's alleged harassment did not stop him from performing the basic requirements of his job; he claims that it just made him less cheerful. (Def.'s Mot. for Summ. J. Ex. A at 115–16.)

Plaintiff's allegations of Munoz's sexual harassment did not effect Lamas's working conditions to the degree required to sustain an action for hostile work environment. Though subjectively Lamas admits that he found the behavior bothering, or pestering, and that it made him less cheerful, he does not claim that the alleged behavior interfered with his work or altered the conditions of his employment. Moreover, as touched upon above, the Court does not find the alleged behavior sufficiently severe or pervasive to have created an intimidating, hostile, or offensive working environment.

**C. Alleged Employer Indifference**

According to the undisputed facts before the Court, Lamas brought Munoz's behavior to the attention of his supervisor Thompson four times within a two to three day period, after which Thompson arranged a meeting between Lamas and General Manager Dennis Mitchell.[1] Lamas also claims that he mentioned the third note to O'Neill.  Both Thompson and Mitchell asked Lamas if he was making a claim of sexual harassment.  Lamas stated that he was not, and that he did not want to file a claim or complaint.  He only wished for his supervisors to speak with Munoz.  According to Thompson and Mitchell, soon after meeting with Lamas, Mitchell and Thompson met with Munoz, with Thompson present as a witness, and told Munoz to stop pursuing Lamas.  At this point there is a discrepancy in the record; Lamas claims that following the meeting between Mitchell, Thompson, and Munoz, Munoz continued making flirtatious statements and non-verbal gestures to him.[2]  Lamas also claims that he reported said actions to Thompson and Mitchell, although when questioned regarding specific dates and the number of times he spoke with them he could not recall.[3]  Thompson and Mitchell however, both state that Lamas made no other allegation of misconduct.  Therefore, whether Lamas reported Munoz's ongoing alleged discrimination is an issue that cannot be decided by the Court; however, in light of all other circumstances and evidence, the Court does not find the resolution of said issue to be material here.

Even viewing all allegations in the light most favorable to the non-moving party, the EEOC has failed to demonstrate that Prospect knew or should have known of Munoz's alleged harassment but did not take adequate steps to address it.  Lamas never filed a complaint of sexual harassment.

---

[1] It is disputed whether Thompson was present at the January 2003, meeting between Lamas and Mitchell. Thompson's account states that she was present, Lamas's account states that only he an Mitchell were present.  The Court however, is less concerned that Thompson may or may not have been present, so much as it is concerned that Thompson helped arrange or encourage that the meeting take place.

[2] The Court notes that Lamas never showed the photo to any of his supervisors, and that Lamas never told anyone about the alleged kiss on the cheek Munoz gave him.

[3] Lamas alleges that following his meeting with Mitchell, he "always," or "consistently" complained about Munoz's behavior.

11

There is no evidence on file, in his record, or anywhere at Prospect that Lamas wanted to file a complaint of sexual harassment. Instead, when Lamas was asked whether he wanted to file a claim or complaint for sexual harassment, he replied "no." Moreover, upon receiving several informal complaints from Lamas, Thompson set up a meeting for Lamas with General Manager Mitchell. Mitchell agreed to, and met with Munoz to inform her that her behavior was inappropriate. Mitchell also informed her that further action would be taken if her behavior persisted. Though Lamas now claims that Munoz continued to make comments and gestures to him in passing, there is no evidence, that Lamas ever filed a claim regarding Munoz's continuing behavior.[4]

Therefore, even viewing the allegations in the light most favorable to the non-moving party, the Court does not find that Prospect supervisors failed to take adequate steps to address Munoz's alleged harassment of Lamas.

**IV. Conclusion**

For the reasons stated herein, the Court grants Defendants' Motion for Summary Judgment. Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (#31) is **GRANTED**;

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter **JUDGMENT** for Defendant.

DATED this 27th day of September 2007.

_____
Kent J. Dawson
United States District Judge

---

[4] In his deposition, Lamas alleged that he informed Mitchell in a letter that the harassment was continuing. A close review of the letter however does not support Lamas's claim. The Court finds that the letter is insufficient to have put Mitchell on notice that Lamas's allegations of harassment by Munoz were continuing. The letter, written in response to other disciplinary matters Lamas had encountered, uses the term "harassment" to describe how several workers on the floor felt about the manner in which supervisor Robert Gonzales treated and let go of employees.